O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: POM WONDERFUL LLC MARKETING AND SALES PRACTICES LITIGATION, | ) Case No. ML 10-02199 DDP (RZx)<br>) MDL Number 2199<br>)<br>) **ORDER GRANTING DEFENDANT'S MOTION**<br>) **FOR DECERTIFICATION**<br>)<br>)<br>) Dkt. No. 246 |

Presently before the court is Defendant's Motion to Decertify Class. Having considered the submissions of the parties, the court is inclined to GRANT the Motion.

**I.  Background**

Plaintiffs' Master Consolidated Complaint ("MCC") alleges, on behalf of a class of consumers, that Defendant POMWonderful LLC ("Pom") falsely and misleadingly advertised that certain Pom juice products provide various health benefits, and that millions of dollars of scientific research demonstrate these benefits.  The MCC brings causes of action for violations of 1) California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17200, et seq., 2) California's Unfair Competition Law ("UCL"), Cal. Civ. Code §

17200, et seq., and 3) California's Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq.

On September 28, 2012, this court certified a damages class comprised of all persons who purchased a Pom Wonderful 100% juice product between October 2005 and September 2010. Now, after the completion of discovery, Pom moves to decertify the class.

**II.   Legal Standard**

An order regarding class certification is subject to alteration or amendment prior to final judgment. Fed.R.Civ.P. 23(c)(1)(c). Such an order is, therefore, inherently tentative. Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 n.11 (1978). Thus, this court is free to modify the certification order in light of subsequent developments in the litigation. Gen. Tel. Co. of SW. v. Falcon, 457 U.S. 147, 160 (1982). The court may decertify a class at any time. Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 966 (9th Cir.2009). On a motion for decertification, as at the certification stage, the burden to demonstrate that the requirements of Federal Rules of Civil Procedure 23(a) and (b) are met lies with the party advocating certification. Marlo v. United Parcel Serv. Inc., 639 F.3d 942, 947 (9th Cir. 2011).

**III. Discussion**

    A.   Damages

Defendant argues that Defendants have failed to show that common issues of fact regarding Plaintiffs's damages predominate over individualized questions, and that Federal Rule of Civil Procedure 23(b)(3)'s predominance requirement has therefore not been met. Defendant first argues that Plaintiffs fail to satisfy new, more stringent predominance requirements set forth in the

2

Supreme Court's recent decision in <u>Comcast Corp. v. Behrend</u>, 133 S.Ct. 1426 (2013). Defendant further asserts that Plaintiffs' two alternative damages models, a "Full Refund" model and a "Price Premium" model, are each legally, as well as methodologically, unsound. The court addresses each issue in turn.

      1. <u>Comcast</u>

First, Defendant contends that <u>Comcast</u> constituted a change in the law regarding damages inquiries under Rule 23(b)(3) and placed a higher burden on Plaintiffs to satisfy Rule 23(b)(3)'s predominance requirement. (Mot. at 4; Reply at 4.) In <u>Comcast</u>, plaintiffs alleged four different theories of antitrust impact against a cable television provider. <u>Comcast</u>, 133 S.Ct. at 1430. The trial court found that three of the four theories were not suited to classwide resolution. <u>Id.</u> at 431. The trial court found the remaining theory capable of class-wide proof, and concluded that damages on that single theory could be determined on a class-wide basis. <u>Id.</u> The plaintiffs' damages expert calculated an amount of damages, but used a model that did not isolate damages resulting from any one of the four theories of antitrust impact. <u>Id.</u> The district court nevertheless certified a plaintiff class, and the Third Circuit affirmed. <u>Id.</u>

The Supreme Court granted certiorari to determine whether "certification was improper because respondents had failed to establish that damages could be measured on a classwide basis," and reversed. <u>Id.</u> at 1431 n.4. The Court emphasized that class certification inquiries, particularly regarding Rule 23(b)(3)'s predominance requirement, require "rigorous analysis" that will often overlap with the merits of the underlying claims. <u>Id.</u> at

3

1432.  The Court looked, therefore, to the methodology employed by plaintiffs' damages expert.  Id. at 1433.

The Court concluded that, because plaintiffs' damages model assumed the validity of all four of plaintiffs' theories of antitrust impact, including three theories unsuitable to class treatment, the damages model failed to tie damages to the lone remaining theory of liability.  Id. at 1433-34.  Thus, the Court reasoned, plaintiffs had not established that damages were capable of measurement on a classwide basis, and without such a showing, plaintiffs could not show that classwide issues of fact predominated over individual questions and satisfied Rule 23(b)(3).  Id. at 1433.

Defendant here suggests that, under Comcast, Plaintiff's damages model must not only prove classwide damages but must also "distinguish accurately between injured and uninjured persons, and calculate the amount of individual damages."  (Mot. at 5.)  This court declines to adopt Defendant's expansive reading of Comcast.  Defendant cites the Federal Circuit's decision in In re Rail Freight Surcharge Antitrust Litig., 725 F.3d 244 (D.C. Cir. 2013) for support.  There, the court interpreted and applied Comcast for the essential proposition that "[n]o damages model, no predominance, no class certification."  In re Rail Freight, 725 F.3d at 253.  Contrary to Defendant's argument, however, the court also explicitly stated, "That is not to say the plaintiffs must be prepared at the certification stage to demonstrate through common evidence the precise amount of damages incurred by each class member."  Id. at 252.  Rather, as the Ninth Circuit has explained, Comcast holds that, under rigorous analysis, "plaintiffs must be

4

able to show that their damages stemmed from the defendant's actions that created the legal liability." Leyva v. Medline Indus., Inc., 716 F.3d 510, 514 (9th Cir. 2013).  Thus, the court proceeds to examine Plaintiffs' damages models and the relationship of those models to Plaintiffs' legal theories, without requiring, as Defendant would have it, that the models distinguish injured class members from uninjured persons or reveal the amount of each individual's damages.

        2.   Full Refund Model

The question whether Plaintiffs' damage models measure classwide damages remains.  "At class certification, plaintiff must present a likely method for determining class damages . . . ." Chavez v. Blue Sky Natural Beverage Co., 268 F.R.D. 365, 379 (N.D. Cal. 2010).  Plaintiffs' damages expert, David Nolte, utilized two alternative models.[1]  The first of these, the "Full Refund" model, assumes that consumers would not have purchased Defendant's juices if not for the alleged misrepresentations.  Under that scenario, the Full Refund model uses the full retail price paid as the measure of damages.  (Nolte Deposition 118:8-10 ("[I]f the health benefits were what caused the purchase, at least predominantly, then a [full] refund would be appropriate;" Nolte Report at 14.) The Full Refund model concludes that consumers spent $450 million on Pom's 100% pomegranate juice and juice blends during the class period, and that class damages are 100% of the amount paid, or $450 million.  (Nolte Report at 14.)

---

[1] Nolte did not "endeavor[] to draw a conclusion regarding which one of those two [models] is necessarily the right one." (Nolte Depo. at 110::18-19.)

5

Defendant argues that the Full Refund model is invalid because it fails to account for any value consumers received. (Mot. at 6.) Even putting aside any potential health benefits, Defendant argues, consumers still received value in the form of hydration, vitamins, and minerals. (Mot. at 7.) Nolte acknowledged that the Full Refund model does not account for any value, such as calories or hydration, received. (Nolte Dep. 141:17-25.)

Defendant is correct. "The False Advertising Law, the Unfair Competition Law, and the CLRA authorize a trial court to grant restitution to private litigants asserting claims under those statutes." Colgan v. Leatherman Tool Group, Inc.,135 Cal.App.4th 663, 694 (2006). "The difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution." In re Vioxx Class Cases, 180 Cal.App.4th 116, 131 (2009). "A party seeking restitution must generally return any benefit that it has received." Dunkin v. Boskey, 82 Cal.App.4th 171, 198 (2000) (internal quotations and citation omitted). Restitutive recovery requires evidence of the actual value of what the plaintiff received. In re Vioxx, 180 Cal.App.4th at 131.

Plaintiffs argue that if a jury determines that consumers did not receive any _wanted_ benefit from Defendant's juices, a full refund would be appropriate. In determining the appropriate amount of restitution, however, the question is not whether a plaintiff received the particular benefit he sought or what the value of that benefit was or would have been. Plaintiffs do not cite, nor is the court aware of, any authority for the proposition that a plaintiff seeking restitution may retain some unexpected boon, yet obtain the

6

windfall of a full refund and profit from a restitutionary award. Nor can Plaintiffs plausibly contend that they did not receive any value at all from Defendant's products.[2] Because the Full Refund model makes no attempt to account for benefits conferred upon Plaintiffs, it cannot accurately measure classwide damages.

### 3. Price Premium Model

Plaintiffs' second, alternative damages model is a "Price Premium" model. The Price Premium model assumes that, absent the alleged misrepresentations, "demand for Pom would have been less and the Pom market price would have been lower." (Nolte Report at 16.) The Price Premium model quantifies damages "by comparing the price of Pom with other refrigerated juices of the same size." Id. This model yields a damage calculation of "about $290 million." Id.

#### i. Fraud on the Market Theory

The parties appear to agree that the Price Premium model depends upon a "fraud on the market" theory. Discussed most often in regard to issues of reliance in the context of securities fraud litigation, frauds on the market result where misrepresentations artificially inflate the price of a stock or other security. See United States v. Berger, 587 F.3d 1038, 1042 (9th Cir. 2009). Frauds on the market are only possible in efficient markets, where the price of (in most cases) a stock is determined by openly disseminated information about a business. See Binder v. Gillespie, 184 F.3d 1059, 1064 (9th Cir. 1999). Because a material

---

[2] In other words, the Full Refund model depends upon the assumption that not a single consumer received a single benefit, be it hydration, flavor, energy, or anything else of value, from Defendant's juices.

7

misrepresentation made in an efficient market will affect the price of a security, regardless whether a particular investor hears the misrepresentation, a stock purchaser's reliance on the misrepresentation is often presumed. Id.

Plaintiffs essentially assert (1) that a presumption of reliance dependent upon Defendant's alleged material misrepresentations establishes the existence of a fraud on the entire juice market, (2) that because of that fraud on the market, every consumer who purchased Defendant's juices was similarly damaged, regardless of motivation or satisfaction, and (3) damages can therefore be measured on a classwide basis. (Opp. at 13:12-16.) In other words, Plaintiffs contend that Plaintiff's misrepresentations shifted the demand curve for Pom juices upward and increased the market price, such that everyone who bought Pom juice paid more than they would have in the absence of the alleged misrepresentations.

As this court explained at the certification stage, before the conclusion of discovery, the facts alleged here could conceivably support a presumption of reliance for purposes of proving liability under the CLRA. (Class Certification Order, Dkt. 111 at 10 (citing Johnson v. General Mills, Inc., 275 F.R.D. 282, 289 (C.D. Cal. 2011) and Chavez, 268 F.R.D. at 376.)) Whether the entire class can be said to have relied upon the alleged misrepresentations for liability purposes, however, does not necessarily speak to the adequacy of a damages model. Indeed, Plaintiffs cite no authority for the proposition that a fraud on the market theory has any relevance to damages.

Nor, for that matter, is the court aware of any authority applying a fraud on the market theory to a consumer action. Putting that issue aside, a plaintiff alleging a fraud on the market must show that the relevant market is efficient. See Smilovits v. First Solar, Inc., 295 F.R.D. 423, 429 (D. Ariz. 2013). This court is not persuaded, nor do Plaintiffs contend, that the market for Defendant's high-end refrigerated juice products operates efficiently. Instead, Plaintiffs assert that they need not demonstrate market efficiency because, for liability purposes, reliance is presumed. Put differently, Plaintiffs argue that because a fraud on the market gives rise to a presumption of reliance, the reverse is true, and a presumption of reliance necessarily means there has been a fraud on the market.

Plaintiffs' logic is flawed. A fraud on the market cannot exist without an efficient market. Binder, 184 F.3d at 1064. By definition, an efficient market prices a good on the basis of all available material information. See Note, The Fraud-on-the-Market Theory, 95 Harv. L. Rev. 1143, 1154 (1982). Reliance comes after the fact. Plaintiffs appear to suggest that, given a presumption of reliance, materiality of a misrepresentation is a substitute for market efficiency.[3] This reasoning has some superficial appeal, as

---

[3] Plaintiffs' citation to In re Steroid Prod. Cases, 181 Cal. App. 4th 145 (2010) does not support their contention that "the measure of restitution or damages may be determined on a class-wide basis through proof of materiality of the misrepresentation." (Opp. at 15:1-2.) While the Steroid court did state that a plaintiff could show that "deceptive conduct caused the same damage to the class by showing that the alleged misrepresentation was material . . .," the court was referring to "damage" in the actual injury sense, and not, as Plaintiffs suggest, in reference to restitution or monetary damages. In re Steroid, 181 Cal. App. 4th at 156-57.

9

universal reliance upon a material fact might have some ultimate effect on demand and prices. If information had no effect on demand, the argument goes, it would not be material in the first instance. Efficiency, however, is not demonstrated simply by any change in price, but rather, in large part, by a change in price that has some empirically demonstrable relationship to a piece of information. Binder, 184 F.3d at 1065. In an inefficient market, in contrast, some information is not reflected in the price of an item. See In re Genesisintermedia, Inc., No. CV 01-9024-SVW, 2007 WL 1953475 at *5 (C.D. Cal. June 28, 2007). In such a market, even a material misrepresentation might not necessarily have any effect on prices. Absent such traceable market-wide influence, and where, as here, consumers buy a product for myriad reasons, damages resulting from the alleged misrepresentations will not possibly be uniform or amenable to class proof.[4]

        ii. Relationship to Theory of Liability

Even assuming that a fraud on the market theory is relevant to a damages inquiry, and that it can be applied in the consumer context, and that it can exist outside an efficient market, and that its existence is established by a presumption of reliance, Plaintiffs "must be able to show that their damages stemmed from the defendant's actions that created the legal liability."

---

[4] The theoretical possibility of "fluid recovery," or a class action cy pres remedy, does not affect the predominance inquiry with respect to class damages. See Feitelberg v. Credit Suisse First Boston, LLC, 134 Cal. App. 4th 997, 1015 (2005). Fluid recovery is a means of paying out damages, not of determining what a damage award should be. See Kraus v. Trinity Mgm't Servs., 23 Cal.4th 116, 127 (2000). Furthermore, even in class actions, fluid recovery cannot be used as a means to obtain nonrestitutionary disgorgement. Feitelberg, 134 Cal. App. 4th at 1016-20.

10

Leyva, 716 F.3d at 514; see also Comcast, 133 S.Ct. at 1433-34. Plaintiffs must demonstrate, therefore, that Defendant's alleged misrepresentations caused Plaintiffs to pay a "price premium" of $290 million more than Plaintiffs otherwise would have paid for Defendant's products in the absence of the misrepresentations.

Plaintiffs' damages expert, Mr. Nolte, testified that he "did a study that showed there was a price premium." (Nolte Dep. at 152:12-13.) Without any survey or other evidence of what consumers' behavior might otherwise have been, and after excluding a series of products for various reasons of varying persuasive power, the Price Premium model uses an average of refrigerated orange, grape, apple, and grapefruit juice prices as a benchmark.[5] (Nolte Report at 18.) While Nolte opined that "the price premium is attributed to something, and health benefits would seem to be a logical inference in light of this particular product," he also explained that he "didn't do a study that addressed various consumer motivations." (Nolte Depo. at 152:17-20, 153: 13-15.)

In other words, as Plaintiffs acknowledge, Nolte made no attempt, let alone an attempt based upon a sound methodology, to explain how Defendant's alleged misrepresentations caused any amount of damages. Instead, Nolte simply observed that Pom's juices were more expensive than certain other juices. Rather than answer the critical question why that price difference existed, or to what extent it was a result of Pom's actions, Nolte instead assumed that 100% of that price difference was attributable to

---

[5] There does not appear to be any basis to believe that fully informed consumers would choose one or any of these juices, nor to believe that class members would all pay the same amount for the alternate juices.

11

Pom's alleged misrepresentations. Put differently, Nolte assumed, without any methodology at all to support the assumption, that not a single consumer would have chosen Pom juice over some agglomeration of orange, grapefruit, apple, and grape juice if not for Pom's allegedly deceptive advertising.[6] Rather than draw any link between Pom's actions and the price difference between the four-juice average benchmark price and average Pom prices, the Price Premium model simply calculates what the price difference was. This damages "model" does not comport with Comcast's requirement that class-wide damages be tied to a legal theory, nor can this court conduct the required "rigorous analysis" where there is nothing of substance to analyze.[7]

B. Ascertainability

Courts have often held that, in addition to the Rule 23 factors, plaintiffs seeking class certification must demonstrate that an ascertainable class exists. See Wolph v. Acer Am. Corp., 272 F.R.D. 477, 482 (N.D. Cal. 2011); Chavez, 268 F.R.D. at 376; see also Berger v. Home Depot USA, Inc., 741 F.3d 1061, 1071 n.3 (9th Cir. 2014) (referring to "threshold ascertainability test"). This is not to say that the identities of class members must be known at this stage, but rather that there must be some

---

[6] The methodology required to explain consumer behavior will vary, of course, with the nature of the relevant product and circumstances of sales. Single use products, such as, for example, an expensive pill claiming to cure baldness, likely require less rigorous methodologies and models than do consumables such as Defendant's juices, which consumers presumably purchase for a wide variety of reasons.

[7] For these and related reasons, Nolte's report and testimony are not admissible under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

12

administratively manageable method of determining whether a person is a class member.  Id.

Class actions, and consumer class actions in particular, each fall on a continuum of ascertainability dependent upon the facts of the particular case or product.  While no single factor is dispositive, relevant considerations include the price of the product, the range of potential or intended uses of a product, and the availability of purchase records.  See Red v. Kraft Foods, Inc., No. CV 10-1028-GW, 2012 WL 8019257 at *5 (C.D. Cal. Apr. 12, 2012.)  In situations where purported class members purchase an inexpensive product for a variety of reasons, and are unlikely to retain receipts or other transaction records, class actions may present such daunting administrative challenges that class treatment is not feasible.[8]  See, e.g., In re Phenylpropanolamine Prods., 214 F.R.D. 614, 620 (W.D. Wash. 2003) (describing critical manageability problems concerning sales of a three dollar medication, despite possibility of fluid recovery); Sethavanish v. ZonePerfect Nutrition Co., No. 12-2907-SC, 2014 WL 580696 at *5 (N.D. Cal. Feb. 13, 2014) (describing intra-circuit split and denying certification because proposed class of nutrition bar purchasers would not be ascertainable).

Here, Plaintiffs acknowledge that, based on the volume of product sold, every adult in the United States is a potential class member.  Realistically, the class includes ten to fifteen million purchasers.  These millions of consumers paid only a few dollars

---

[8] As the Red court noted, these administrative difficulties implicate not only the threshold ascertainability question, but also manageability and superiority concerns under Rule 23(b)(3). Red, 2012 WL 8019257 at * 4.

13

per bottle, and likely made their purchases for a variety of reasons.[9]  No bottle, label, or package included any of the alleged misrepresentations.  Few, if any, consumers are likely to have retained receipts during the class period, which closed years before the filing of this action.  This case therefore falls well toward the unascertainable end of the spectrum.  Here, at the close of discovery and despite Plaintiffs' best efforts, there is no way to reliably determine who purchased Defendant's products or when they did so.

**IV.   Conclusion**

For the reasons stated above, Defendant's Motion to Decertify Class is GRANTED.

IT IS SO ORDERED.

Dated: March 25, 2014

DEAN D. PREGERSON
United States District Judge

---

[9] Plaintiffs do not dispute that consumer motivations in this case likely vary greatly, and could include a wide array of sentiments such as "I was thirsty," "I wanted to try something new," "I like the color," "It mixes well with other beverages," or even, "I like the taste," or, as Plaintiffs contend, "It prevents prostate cancer."